## The People on the relation of John Hedgman v. The Board of Registration of the First Ward of the city of Detroit.

*Citizenship : Children born abroad of parents born in slavery.* One who was born in Canada of parents of African blood born in Virginia and held there as slaves until they emigrated to Canada, does not, by removing to the United States, become a citizen by virtue of the act of congress of April 14, 1802 (*2 U. S. Stat. at Large, p. 155, § 4*), making citizens of the children born abroad of parents "who now are or have been citizens." Persons held in servitude as slaves were not citizens of the United States.

*Dred Scott's case.* The Dred Scott case commented on and held to have been practically overruled before the adoption of the fourteenth and fifteenth amendments to the constitution.

*Constitutional law : Citizenship.* The fourteenth and fifteenth amendments to the federal constitution do not apply to such a case.

*Heard October 22. Decided October 23.*

Application for *mandamus*.

*Alfred Russell*, for the relator.

*D. C. Holbrook, City Counselor*, for the respondents.

COOLEY, J.

This is an application for a *mandamus* to compel the respondents to register the relator as a voter. The facts

are, that his parents were persons of African blood, born in Virginia, and held there as slaves; that they left there and went to Canada in 1834, where from that time they resided, and where the father still resides; that the relator was born in Canada some thirty-five years since, and continued to reside there until he was nearly twenty years of age, when he removed to this state, and now resides in said first ward. If these facts show him to be a citizen of the state of Michigan, he is entitled to be registered; otherwise not.

It is claimed, on behalf of the relator, that he becomes a citizen by force of the new amendments to the federal constitution. The particular point relied upon is, that by the fourteenth amendment all persons born in the United States, and subject to the jurisdiction thereof, are declared to be citizens; that, consequently, the parents of the relator are such, and the laws of congress, which make citizens of the children of citizens born abroad, will apply to the case of the relator, and render him a citizen also. On the other hand, it is argued by the city counselor, who appears for the respondents, that the laws of congress do not reach the case of one whose parents were not citizens at his birth, and that the parents of the relator were not, since it is admitted they were of African blood, and by the decision in the case of *Dred Scott, 19 How., 393,* which established the rule of law up to the time of the adoption of the fourteenth amendment, persons of African descent were not and could not be citizens.

If this application depended upon the case of Dred Scott, we should have little difficulty in deciding it. The decision there declared that free blacks were not citizens; but, though when first decided it must have commanded that respectful deference and strict obedience which is always due to the decisions of the court of last resort on

questions of federal law, we think the time has gone by when it can be regarded as possessing the force of authority. For upwards of ten years it has been wholly ignored in the action of the political departments of the federal government, and some years before the adoption of the fourteenth amendment, the supreme court of the United States had practically overruled it by admitting persons of African descent to practice at its bar. We think, therefore, that we are justified by the action of that tribunal, in treating its former decision as practically set aside.

But we do not think the case can turn upon any question of the binding force of that decision. The point in dispute here is, whether the parents of the relator were citizens of the United States. The record shows that they were not free, but held in servitude, while they remained within its jurisdiction.

Now, it is undeniable that those persons should never have been slaves, and that neither they nor any others ought in justice to lose any right or privilege in consequence of their having been the victims of a wrong. But questions like the one before us can never be disposed of on considerations merely of what ought to be, or ought to have been. We cannot shut our eyes to historical facts because of their being disagreeable to ourselves or discreditable to the country. Slavery was the great ugly fact of our history; it affected the peace, the morals, the happiness of the people; it threatened the existence of the government; at last it convulsed the nation in civil war. Private interests and public interests have been, and still for a long time must be, affected by the mere fact of its having existed, and we can no more ignore it than those who established independence could ignore the previous events that made independence essential. When they came to adjust their new relations, those previous events must needs have more or less bearing.

Here the question is, what the *status* of certain persons was before emancipation; and, if we find they were slaves, we are compelled, however unwillingly, to recognize the fact and its consequences.    The supreme court of the United States has recently been obliged to decide that contracts growing out of the institution of slavery, are not only valid since the new amendments, but that the people of the states have no power, and · congress can confer none upon them, to nullify such contracts by their new constitutions.— *White v. Hart, 13 Wall., 647; Osborn v. Nicholson, Ibid., 654.*  As a consequence, state courts in the southern states are now, under the mandate of the federal court, enforcing contracts made on the sale of men, and considering questions of their market value, and of their soundness as articles of merchandise, precisely as if they were actually mere beasts of burden.    In short, we have abolished slavery, but we have not abolished the pre-existing history, and we cannot prevent the consequences following the facts recorded.

Now, citizenship implies the obligations of allegiance on the one side, and the rights of protection on the other.    From the very nature of chattel slavery, neither the obligations nor the rights could exist, except in a very imperfect state. Slavery is the negation of natural right, and the rightful resistance to it can only be limited by considerations of prudence.    In the declaration of independence, liberty is ranked with life as among the things which are inalienable, and Warren, the chief of the early martyrs of the revolution, declared slavery the greatest of all crimes in its victim, if it were possible for him to be rid of it.    It is obvious that the person subjected to it, is denied the rights of a citizen; and whatever of obedience a government can exact of him, is not upon the ground of his being a party to the fundamental compact, but as a part of the system which takes from him those inherent rights which, volun-

tarily, he had no power to surrender.    For these reasons the municipal law, neither here nor elsewhere, recognized slaves as citizens.

We have no information concerning the reasons which induced the relator's parents to abandon the state of their birth and go to Canada, but the inference from the record is a legitimate one, that they went to escape from bondage to freedom.    They did not go as representatives of the United States, proud of its flag and its liberties, but as fugitives from the United States, fearing its flag and hating its oppression.    They did not carry citizenship with them, but they fled from slavery.    They abandoned a country to which they admitted no obligations, because its laws denied them all rights.    So far from extending to them its protection, the laws of the country they left, volunteered the assistance of its officers in seeking out and seizing them, if they should venture to seek liberty, in order that they might be restored to a bondage which promised to be perpetual to them and their descendants.    What possible obligation could the mere fact of birth upon the soil of America impose upon a person thus condemned by its laws to be the hopeless slave, the mere chattel, subject to be bought and sold, in his person and posterity, at the will of another?    We may bring this to a proper test, perhaps, by supposing that a war should unhappily spring up between ourselves and the neighboring dominion, and that our government should endeavor to enforce the obligations of citizenship against any of those fugitives who had sought in that country the liberty denied them at home; should endeavor, for example, to force them into its armies, or to visit them with the penalties of treason if they should voluntarily enter the armies of their adopted country;—is it not clear that the moral sense would be shocked, and the instincts of justice implanted in every man's breast, revolt

at so gross and palpable a misapplication of the doctrines of natural allegiance? The supposition is indeed too monstrous to be indulged. We are driven to confess, however mortifying it may be to our national self-complacency, that, up to 1861, Canada was, as regards the class in question, a refuge from American oppression, and that those who fled thither, were guiltless of wrong in repudiating allegiance to the government they escaped, and in rejecting such protection as it would have extended to them.

It follows, therefore, that the parents of the relator were never citizens of the United States prior to the adoption of the fourteenth amendment. That amendment, it is clear, does not make them such. It declares that, "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States, and of the state wherein they reside." These persons are not subject to the jurisdiction of the United States. They have chosen another jurisdiction, and cannot have our citizenship forced upon them. The fourteenth amendment makes the offer of citizenship, but, if they come within the offer, they can accept it only by bringing themselves within the jurisdiction, which hitherto they have not chosen to do. The relator himself does not come within the terms of the fourteenth amendment, because he was not born within the United States. If he is not a citizen by virtue of his parents having been such, then, allegiance by birth, so far as it exists at all, must be due from him to the British government, under which he was born, and he might at any time return and claim the rights of a British subject. Such, we think, is his position. He can become an American citizen, but only in the same modes as any other person of Canadian birth.

The fifteenth amendment does not help the case. That declares that the right of citizens of the United States to

vote, shall not be denied or abridged by the United States, or by any state, on account of race, color or previous condition of servitude. Under this the prerequisite is, that he is a citizen. The relator was never in a condition of servitude, and his color is no impediment to citizenship. He has the same rights with any native-born white British subject to become a citizen under the naturalization laws, if he shall desire to do so.

It follows that the writ must be denied.

CHRISTIANCY, CH. J., and GRAVES, J., concurred,

CAMPBELL, J.

I think the act of congress which gives children citizenship by reason of parentage, inasmuch as it refers only to children of those who then were and thereafter should be citizens at the time the children were born, cannot apply to any whose parents, at the time of their birth, were domiciled abroad, and not recognized by American law at the time, as entitled to civil rights. If the fourteenth amendment now applies to the parents,—a point not now before us,—it cannot act retrospectively to change facts formerly existing. I concur, therefore, in holding the relator is not a citizen.